# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES EASTER,<br><br>                          Plaintiff,<br>  vs.<br><br>CDC, et al.,<br><br>                        Defendants. | CASE NO. 09cv0555-LAB (RBB)<br><br>**ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION; AND**<br><br>**ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT** |

      Plaintiff Charles Easter, formerly a prisoner at California's R. J. Donovan Correctional Facility, has brought claims under 42 U.S.C. § 1983 based on Defendants' alleged failure to keep him safe while he was in prison. His claims for injunctive relief were dismissed as moot, and he seeks only damages. The motion of Defendants Morris, Panichello, and Perez for summary judgment was referred to Magistrate Judge Ruben Brooks for report and recommendation, pursuant to 28 U.S.C. § 636. On June 29, 2011, Judge Brooks issued his very thorough and lengthy report and recommendation (the "R&R"), which recommended denying the motion. The R&R included an order denying Easter's request for additional discovery, and also found that the Fed. R. Civ. P. 56(d) standard for granting additional discovery was not met.

/ / /

Easter never objected to the denial of additional discovery and therefore has waived any objections he might have had to that order. *See* Fed. R. Civ. P. 72(a). The R&R sets forth the procedural history of this case at length, and the Court does not repeat it here. The three Defendants are the only remaining Defendants in this case, and filed objections to the R&R. Easter also filed objections.

A district court has jurisdiction to review a Magistrate Judge's report and recommendation on dispositive matters. Fed. R. Civ. P. 72(b). "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." *Id*. "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The Court reviews de novo those portions of the R&R to which specific written objection is made. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc). Because Defendants' objections are detailed, thorough, and extensive, the Court has conducted a full de novo review of the R&R's conclusions. The Court **ADOPTS** the R&R's unobjected-to factual findings, as well as the unobjected-to conclusion that Easter exhausted his administrative remedies.

Easter's objections are in fact a reply to Defendants' objections, and repeat the arguments he raised in his opposition to the motion for summary judgment. They are therefore subsumed within the Court's review.

## I. Legal Standards

Federal Rule of Civil Procedure 56(c) empowers the court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001). The moving party bears the initial burden of

demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive law. *Id*. at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the nonmoving party. The moving party need not disprove the other party's case. *See Celotex*, 477 U.S. at 325; *see also Garneau v. City of Seattle*, 147 F.3d 802, 807 (9th Cir. 1998).

The non-moving party cannot oppose a properly supported motion for summary judgment by resting on "mere allegation or denials" of facts. *Anderson*, 477 U.S. at 256. The Court does not make determinations of credibility or weigh the evidence at this stage. *Id*. at 255. The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007). That said, the Court is not required to draw unreasonable inferences, *id*. at 381 n.8 (court should draw "all inferences in favor of the nonmoving party *to the extent supportable by the record*"), or accept conclusory or speculative testimony. *Anheuser-Busch*, *Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 345 (9th Cir. 1995) (holding that conclusory or speculative testimony was insufficient to defeat summary judgment). "While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through

/ / /

admissible evidence." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (citing *Celotex*, 477 U.S. at 324).

As explained in the R&R, prisoners have a right to be protected from violence while in custody. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). "Prison officials must take reasonable steps to protect inmates from physical abuse." *Hoptowit v. Ray*, 682 F.2d 1237, 1250 (9th Cir. 1982). To establish an Eighth Amendment violation, a plaintiff must show that the defendant acted with deliberate indifference to a substantial risk of serious harm to the prisoner's safety. *Farmer*, 511 U.S. at 834. The subjective element of this requirement means that prison officials can only be liable if they knew of and disregarded an excessive risk to inmate health or safety. *Id*. at 837.

Defendants have raised the defense of qualified immunity, arguing their decisions were made in good faith and with a reasonable belief that they were lawful. They bear the burden of proving this. *See Crawford–El v. Britton*, 523 U.S. 574, 586–87 (1998). Having reviewed the R&R, the Court finds its discussion of the qualified immunity doctrine incomplete. The R&R correctly notes that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity provides "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (citation and internal quotation omitted). Application of this doctrine requires a two-part inquiry. The Court asks both whether the facts show Defendants violated a constitutional right, and whether the right in question here was clearly established at the time. *Delia v. City of Rialto*, 621 F.3d 1069, 1074 (9th Cir. 2010). Because the right was clearly established, *Farmer*, 511 U.S. at 832–33, the Court focuses on the first part of this inquiry.

Regardless of whether the Court considers Easter's substantive claim, or Defendants' qualified immunity defense, the crucial issue here is whether Defendants knew they were failing to protect Easter from danger, or whether they made a reasonable mistake about it.

09cv0555

*See Brooks v. Seattle*, 599 F.3d 1018, 1022 (9th Cir. 2010). The Court finds the R&R, though very thorough in other respects, does not give adequate consideration to the "reasonable mistake" standard, which Defendants have pointed out in their objections. The standard "allows ample room for reasonable error on the part of the [official]," *Knox v. Southwest Airlines*, 124 F.3d 1103, 1107 (9th Cir.1997), including reasonable mistakes of fact. *Butz v. Economou*, 438 U.S. 478 (1978) (discussing qualified immunity). Likewise the standard for proving an Eighth Amendment claim for failure to protect requires a showing that an official was aware of facts from which he could have inferred that a substantial risk of harm existed, *and* that the official actually drew that inference. *Farmer*, 511 U.S. at 837. In other words, to prevail on his claim, Easter must show Defendants knew he was in danger, and were not reasonably mistaken about it. To prevail on their defense of qualified immunity, Defendants must show they were reasonably mistaken.

For qualified immunity, the facts are evaluated in light of what each Defendant knew at the time, and in light of each Defendant's authority and ability to act. *See Cunningham v. Gates*, 229 F.3d 1271, 1289–90 (9th Cir. 2000) (officers present at scene of alleged violation could not be liable because they had no realistic opportunity to prevent it).  An official who was required to act as he did could not avail himself of the qualified immunity defense, which is for discretionary actions, but by the same token would not be liable for deliberate indifference. *See Jeffers v. Gomez*, 267 F.3d 895, 913 (9th Cir. 2001) (holding prison official was not liable merely for carrying out his superiors' decision regarding prisoner security, in the absence of evidence he was deliberately indifferent in some other way).

If Defendants are entitled to qualified immunity, the Court is obligated to dismiss claims against them immediately, and not allow the case to proceed further. *See Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009) (stressing the importance of resolving qualified immunity question at the earliest possible stage).

It is worth noting that a generalized claim of collective or institutional failure to protect Easter is not cognizable here. Such claims are recognized in other contexts, such as where

a plaintiff seeks injunctive relief, where defendants have conspired or otherwise worked together to violate a plaintiff's rights, or where an institution's policy caused the violation. But here, it will not suffice for Easter merely to show that *someone* should have protected him, or that the attack on him was *someone*'s fault; he must show that these three Defendants knew they should have protected him, but didn't do so. *See Redman v. County of San Diego*, 942 F.2d 1435, 1454 (9th Cir. 1991) (citing *Leer v. Murphy*, 844 F.2d 628, 633–34 (9th Cir. 1988)) (holding that, in § 1983 claim, focus is on each individual defendant's fault and whether that fault caused harm).

With these standards in mind, the Court turns to the question of whether Defendants are entitled to summary judgment either on the merits or on the basis of qualified immunity.

## II. Discussion

Easter argues each of the three Defendants is liable because they caused him to be transferred into a prison yard[1] where they knew he had enemies, and as a result he was later attacked and stabbed by an enemy. Easter says on August 27, 2006, he was involved in a riot instigated by prisoners who were members of the skinhead gang and who hated "torch blacks," including him. The R&R concluded, correctly, that there was no evidence Easter was actually involved in this riot, that he was not injured, and that he later denied being involved.

Some of the same skinhead prisoners, Easter alleges, were in Yard IV when Easter was later transferred there. On November 14, 2006, another riot broke out, and Easter was attacked and stabbed. His assailant, inmate Hill, was allegedly a skinhead. Hill was not at the prison at the time of the first riot and thus obviously did not participate in it. Easter's theory is that he was put in danger by being housed in the same yard as skinhead prisoners.

### A. Defendant Perez

Perez was the officer who assigned Easter to his housing. He alleges she could have assigned him to any yard she wanted to, but chose to assign him to Yard IV, where his

---

[1] Easter apparently refers to his housing as yard four because the housing he was assigned to used yard four as its exercise area. Although Defendants refer to his housing by facility number or housing unit number, the Court accepts Easter's designation of his housing for purposes of ruling on this motion.

enemies were. He does no more than allege, however. (Opp'n to Mot. for Summ. J. (Docket no. 76) at 7:1–7.) He repeats his allegation in his objections to the R&R. But there is no indication that he has personal knowledge of this, or that his allegations are anything other than his own speculation and conclusions.

The R&R cited Defendants' motion itself, as well as Perez's declaration, as evidence that she could have chosen to assign Easter to some other yard. But her declaration (Docket no. 52-3, Ex. L) doesn't show that she had any such authority. Rather, it shows she could assign inmates only to housing units in Facility IV, all of which are also on Yard IV.[2] Perez's declaration also made the following statement:

> My duty is to find cell assignments for inmates housed in Facility IV. Any special considerations that would be taken into account when deciding where to house an inmate, such as the location of an inmate's enemies, is evaluated by the Inmate Classification Committee ("ICC"), and I rely entirely on their determinations when making a housing assignment once they are removed from Administrative Segregation Unit ("ASU").

(Perez Decl., ¶ 5.) Easter points to no contrary evidence.

Although Easter's declaration says Perez could have assigned him to some other yard, nothing in the declaration or any other evidence suggests he had any personal knowledge of whether she had the authority to do this, or that his statement was anything other than bare speculation. To the contrary, all evidence, including Easter's own testimony, shows that he never spoke with her or had dealings with her, and he knew only that she was in charge of Yard IV. (Mot. for Summ. J., Ex. P (Easter Depo. Tr.) at 132:2–22, 137:2–24.) Absent foundation, Easter's speculative testimony would be inadmissible at trial and the R&R should not have relied on it in recommending a ruling on the summary judgment motion. *See Norse*, 629 F.3d at 973 (non-moving party must set forth facts he could prove by admissible evidence). Easter's own conclusions are not evidence, and as such are not

---

[2] It appears the R&R confused some of the numbers in ¶ 3 of Perez's declaration, which says Perez is responsible for transferring inmates from the reception center at building 16 to housing units 17 through 20, and to the dormitory in Facility IV. Apparently, the R&R read this as saying Perez had authority to transfer Easter to *yards* 17 through 20, rather than housing units 17 through 20. A review of ¶ 7 shows this reading is a mistake, however, because it makes clear Easter was assigned to building 17, and that this building is on yard 4.

sufficient to resist summary judgment. *See Anheuser-Busch.*, 69 F.3d at 345 (court ruling on summary judgment motion need not accept conclusory testimony). The uncontroverted evidence therefore shows she could only have assigned him to housing on Yard IV.

Even if Easter could show Perez had authority to assign him to housing not on Yard IV, he has offered no evidence that Perez didn't rely on the ICC's determination about where he could be safely housed. That fact alone would show that she was not deliberately indifferent to Easter's safety.

The R&R also noted that Perez did not review Easter's central file, which Easter says included information that would have made clear to Perez that he was in danger in Yard IV. The fact that she did not review it, however, means she was not subjectively aware of anything she might have learned from it. Perez explains that she does not review inmates' central files, and that the ICC, which makes the determination, does. Easter also testified that he never told her he had enemies in Yard IV. (Easter Depo Tr. at 132:7–15.)

In the face of this uncontroverted evidence, the Court must grant summary judgment in favor of Perez, both because she lacked authority to transfer Easter outside of Yard IV housing, and because she was entitled to rely on the ICC's determination. Easter cannot show she was deliberately indifferent to known danger. And even if she should have known or suspected Easter was in danger, she would be entitled to qualified immunity because her reliance on the ICC's determination shows she was not "plainly incompetent." *See Hunter*, 502 U.S. at 229. The Court therefore rejects the R&R's conclusion that there is a triable issue of fact whether Perez knew Easter should have been transferred to some other yard, and whether Perez had the ability to transfer him.

**B.    Defendant Panichello**

The basis for Easter's claim against Panichello is that Panichello escorted Easter to his new housing assignment on Yard IV, in October of 2006. Easter says he told Panichello he had enemies on Yard IV, and that moving him to Yard IV was a mistake. According to Easter, Panichello told him "we have no where el[s]e to put you." Panichello's version of this event is that Easter didn't tell him about any safety concerns, but that even if Easter had

done so, he would have conducted an inquiry and discovered no basis for concern. The R&R concluded that, if events occurred as Easter says they did, Panichello would be liable, and any mistake would not have been reasonable. The Court disagrees.

The evidence does not suggest that escorting Easter to his new housing unit as authorized and directed by someone else was a discretionary action, and therefore qualified immunity does not apply. At the same time, the fact that an officer is carrying out an action authorized by a committee that has reviewed and investigated the facts is a very thin reed on which to hang a claim for deliberate indifference. It would be a different matter if Panichello had taken it upon himself to change Easter's housing assignment, or if Panichello had escorted Easter to housing not authorized for him. But for obvious reasons, prison officers are not required to accede on the spot to a prisoner's housing request, nor are they required to stop whatever they may be doing merely because a prisoner objects. This is particularly true where, as here, the prisoner's explanation is contradicted by the record.[3] Furthermore, there is no evidence Defendant Panichello played any role in deciding where Easter should be housed, or that he had any authority to override the housing decision. *Compare Masterson v. Huerta-Garcia*, 2011 WL 4479772, slip op. at *5 (E.D.Cal., Sept. 26, 2011) ("[T]here is no dispute that the officers escorting Plaintiff to the vehicle for his transfer were not responsible for the transfer and lacked authority to override the decisions of prison administrators. Their actions did not rise to the level of deliberate indifference to a known risk.")

Furthermore, there is no showing that the initial transfer of Easter to his new housing on Yard IV caused Easter any harm. Easter was moved to Yard IV in October, 2006 and the second riot, in which he was injured, happened on November 14, 2006. Accepting all Easter's allegations as true, if Panichello had moved Easter to his new housing but Easter had been moved soon after, he would not have been injured. There is no evidence the initial move to Yard IV caused Easter's injury. *See Redman*, 942 F.2d at 1454 ("To impose liability

---

[3] Easter told Panichello that he was not supposed to be moved to Yard IV, which was incorrect because Easter had been cleared for transfer to Yard IV. What Easter apparently means by this was that the ICC made the wrong decision in clearing him.

under section 1983 on an individual defendant, the defendant's act or omission must *cause* the deprivation of the plaintiff's constitutional rights.") The error that led to Easter's injury (if there was error) was in leaving him in Yard IV for an extended period of time without transferring him to another, safe location. There is no evidence Panichello had any authority to effect a transfer or overrule the ICC's decision, nor was he part of the ICC that made housing decisions. (Mot. for Summ. J., Ex. E (record of ICC review, listing ICC members), Ex. K (Panichello Decl.), ¶ 3 (stating that Panichello's responsibilities were to assist the captain and supervise lower-ranking officers).)

The only other basis for holding Panichello liable would be for his failure to investigate Easter's claims about being in danger. Panichello says if Easter had expressed concerns, he would have investigated them. (Panichello Decl., ¶ 6.) Viewing the evidence in the light most favorable to Easter, the Court assumes at this stage that Easter told Panichello he feared for his safety, and Panichello did not investigate. This is not the end of the analysis, however. Had Panichello looked into Easter's concerns, there is no evidence he would have found out anything the ICC and Captain Morris did not already know.

Because the Court views the evidence in the light most favorable to Easter, the Court assumes that if Panichello had investigated, he would have found some information. The problem for Easter is that the information was already known to the ICC and Morris. Easter's contention is not that additional evidence remained to be discovered, but that the ICC and Morris already knew facts putting them on notice he was in danger. The evidence does not support a finding that Panichello had told the ICC what they already knew (that Easter and some skinheads were enemies), the result would have been any different. In other words, there is no evidence to support a finding of causation.

**C.    Defendant Morris**

The basis for Easter's claims against Morris is that Morris allegedly knew that Easter was in danger in Yard IV, that Easter told Morris this on more than one occasion, and that Morris ignored the danger and allowed him to come to harm. As noted, the same basic claims are made against Panichello, although Morris was a higher-ranking officer and,

according to Easter, was more aware of the danger. For his part, Morris denies Easter ever expressed concern about being in danger. Morris was a member of the ICC, and it is a reasonable inference he knew everything that was presented to the ICC as well as everything the ICC did. For this reason, Morris is in a different position than either Perez or Panichello. This charge is also the most serious, because it deals with the exercise of supervisory authority by those charged with determining whether Easter was in danger in Yard IV.

Morris points to evidence that Easter initially attempted to participate in the first riot, but then responded to officers' commands to get down and did not participate. (Mot. for Summ. J., Ex. J (Morris Decl.), ¶¶ 5–7.) He was not injured. (*Id.*, Ex. B.; Morris Decl., ¶ 6.) He was placed in administrative segregation, and on August 30, 2006 the ICC conducted a review to determine whether he posed a security risk, and the record of that review is attached as Ex. E. In pertinent part, the record says he was being placed in a mixed yard with black and Northern Hispanic associated inmates, that he had no concerns about enemies in that yard, and that there were "no additional case concerns at this time." (Ex. E.) The next review was set for November 22, 2006.

The next month, on September 28, an officer named R. Velo who was also part of the ICC completed a report stating that Easter had no known enemies.[4] (Mot. for Summ. J., Ex. D.) Morris's declaration also states that on September 29, 2006, the ICC interviewed Easter and determined both that he was no longer a threat to the institution's safety and security and that he had no enemies or security concerns in the facility (which, at that time, was facility two.) (Morris Decl., ¶ 11.) Morris noted that Easter asked to be moved out of Facility IV, but did not identify any specific enemies nor did he express safety concerns. (*Id.*, ¶ 13.) The determination that Easter had no known enemies is unsupported by documentary

///

---

[4] The form on which the report is recorded, however, asks for the enemies' names and identification numbers. The instructions say the form "is used to document inmates/parolees or potential inmates who should be kept separate . . . ." If, as Easter claims, he knew he had enemies but didn't know their names, it is unclear whether the report would reflect that, or whether none would be listed.

evidence except for the staff record attached as Ex. J.[5] Easter, however, said he did tell Morris he had enemies on the yard where he was housed. (Easter Decl. at 123:22–124:22.) Easter says he knew he had enemies on Yard IV because the ICC had told him they moved his enemies to that yard. (*Id*. at 147:12–23.) He was unable to provide their names because he didn't know them. (*Id*. at 147:12–19, 148:8–10.)

On the basis of this evidence, a reasonable jury could accept Easter's contention that he had a number of enemies who were skinheads, but that he didn't know their names. The jury could accept his statement that the ICC told him the skinheads who had participated in the riot (and whom Easter had attempted to attack) were in Yard IV, and that when Easter learned he was being transferred there, he brought his concerns to Morris's attention. The jury could disbelieve Morris's testimony that Easter never expressed concerns for his safety in Yard IV. The R&R also correctly noted that Easter's failure to identify a particular inmate or inmates by name does not relieve Morris of liability.

If the documentation Morris's declaration alluded to had been included in the record, he might have been entitled to qualified immunity. For example, if Morris could point to a record of the ICC's September 30 decision, he might show that the committee considered but reasonably disbelieved Easter's claim that he had enemies on Yard IV, and Morris might show he relied on that determination instead of Easter's later remarks. The only document suggesting that Easter had no enemies was Velo's report, but as discussed above, that may merely mean he had no enemies whose names he knew. The fact that Easter didn't participate in the first riot would not give Morris reason to believe he had no enemies. Rather, it merely means his participation in the riot is unavailable as evidence that he had enemies. His attempt to participate in the riot, for which he was convicted, could reasonably be taken as evidence he was hostile towards the skinheads, and they towards him.

/ / /

/ / /

---

[5] Morris's declaration erroneously refers to Ex. E as the record of the ICC's decision on September 29. Ex. E, however, is dated August 30. No ICC document dated September 29 is included in the record.

Morris' argument concerning the impracticability of protecting Easter is unavailing. Easter's professed concerns for his safety would not have required that he be segregated from all caucasian prisoners, only that he be kept adequately protected from skinhead prisoners. There is no showing it was impossible or impractical to do this.

In short, the evidence is in conflict, and the Court cannot resolve that conflict at the summary judgment stage. The Court cannot conclude Morris is entitled to summary judgment on the merits, nor has he shown he is entitled to qualified immunity because he acted reasonably under the circumstances.

### III. Conclusion and Order

The Court agrees with the R&R that additional discovery is not appropriate under Fed. R. Civ. P. 56(d), and Easter's arguments do not meet the standard for any other relief under that provision. Furthermore, Easter never objected to the R&R's denial of additional discovery. *See* Fed. R. Civ. P. 72(a) (failure to file timely objections to magistrate judge's order on nondispositive pretrial matter waives any error).

Easter's objections to the R&R are **OVERRULED**. The objections of Defendants Perez and Panichello are **SUSTAINED**, and the motion for summary judgment is **GRANTED** as to claims against them. Defendant Morris's objections are, however, **OVERRULED** and the motion is **DENIED** as to claims against him.

**IT IS SO ORDERED**.

DATED: March 7, 2012

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge